DECISION
{¶ 1} Relator, Ashwani K. Sachdeva, commenced this original action requesting that this court issue a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its order declaring an overpayment of living maintenance wage loss benefits for the time period June 7, 1998 through October 25, 1998, and finding fraud, and to issue a new order that declares an overpayment only for those weeks "between June 7, 1998 and October 25, 1998 where his aggregated income between his two jobs exceeded $549.79," his full weekly wage.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In her decision, the magistrate concluded the commission properly terminated the payment of living maintenance wage loss to relator, properly declared an overpayment for the time period from June 7, 1998 through October 25, 1998, and had some evidence to support its finding that relator filed a fraudulent application for benefits. Accordingly, the magistrate determined the requested writ should be denied.
 {¶ 3} Relator has filed two objections to the magistrate's conclusions of law. In the first, relator contends the magistrate improperly determined that relator's living maintenance wage loss benefits properly could be terminated if he was medically capable of performing the duties of his former position of employment.
 {¶ 4} According to the magistrate's findings of fact, to which relator does not object, relator received living maintenance wage loss benefits beginning January 9, 1995 and terminating October 25, 1998, when he reached the limit of his 200-week eligibility for living maintenance wage loss benefits. Accordingly, the commission`s order did not terminate relator's benefits; they were terminated because his eligibility lapsed under the 200-week rule. Rather, the commission declared an overpayment because it determined relator's application documents were fraudulent. While we acknowledge that in some cases a determination to terminate benefits could be intertwined with the commission's declaring an overpayment, in this case, it is not: the overpayment was premised on the lack of complete information in the documents relator filed seeking living maintenance wage loss benefits. As a result, the magistrate did not have to address whether relator's living maintenance wage loss benefits could be terminated because he was medically capable of returning to his former position of employment. Insofar as the magistrate determined that issue, we decline to adopt that portion of the magistrate's decision, and we thus sustain relator's first objection to the extent indicated.
 {¶ 5} The remainder of relator's objections reargue those matters adequately addressed in the magistrate's decision: the commission's declaring an overpayment and the commission's finding fraud. The magistrate properly analogized this case to State ex rel. Ellis v. Indus. Comm. (2001), 92 Ohio St.3d 508. There, the Supreme Court determined that because the payment of benefits was premised on fraudulent documents, the commission did not abuse its discretion in finding no basis upon which to allow the claimant to retain any of the temporary total disability compensation arising from the fraudulent documents, not just the portion during which the claimant had been employed. Similarly, here, the commission determined relator's application for living maintenance wage loss was premised on fraudulent information concerning relator's jobs. Because the documents on which the benefits were paid were fraudulent, the commission properly could declare an overpayment of all benefits obtained as a result of the fraudulent documents.
 {¶ 6} Finally, to the extent relator contests the commission's finding of fraud, the objection is overruled for the reasons set forth in the magistrate's decision that addressed the elements of fraud and compared them to the evidence presented to the commission. Relator's second objection is overruled.
 {¶ 7} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and, with the exception noted, applied the salient law to them. Accordingly, with the exception noted, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections sustained in part and overruled in part; writ denied.
PETREE, P.J., and BROWN, J., concur.
 DECISION IN MANDAMUS {¶ 8} Relator, Ashwani K. Sachdeva, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which terminated the payment of living maintenance wage loss to relator, declared an overpayment for the time June 7, 1998 through October 25, 1998, and finding fraud.
Findings of Fact:
 {¶ 9} 1. Relator sustained a work-related injury on July 22, 1993, and his claim was allowed for: "sprain right wrist; fracture right radius." At the time of his injury, relator was a fabric cutter.
 {¶ 10} 2. Relator received temporary total disability ("TTD") compensation from December 16, 1993 through August 24, 1994.
 {¶ 11} 3. Relator entered into a rehabilitation agreement with the Ohio Bureau of Workers' Compensation ("BWC"). As part of that plan, he was paid living maintenance ("LM") compensation from August 29, 1994 through January 8, 1995.
 {¶ 12} 4. After completing the rehabilitation program, relator began receiving living maintenance wage loss ("LMWL") benefits beginning January 9, 1995. He was paid these benefits through October 25, 1998, when he reached the limit of his 200-week eligibility for LMWL benefits.
 {¶ 13} 5. Thereafter, in November 1998, the BWC special investigation unit in Dayton, Ohio, received an anonymous tip that relator was working for Fred J. Miller and receiving compensation under his wife's name during the time he was receiving benefits from the commission.
 {¶ 14} 6. An investigation began and, on April 24, 2000, the BWC referred the matter to the commission requesting that the commission declare an overpayment of LMWL benefits for the time period June 7, 1998 through October 25, 1998, that the commission terminate the payment of further LMWL benefits, and that the commission find that relator had committed fraud by concealing the fact that he was working so he could continue to receive LMWL benefits.
 {¶ 15} 7. As part of her investigation, Special Agent Kris Sharp spoke with Marlene Miller, a Fred J. Miller employee. Ms. Sharp noted the following in her report:
 {¶ 16} "On April 20, 1999 Sharp spoke with Fred J. Miller employee Marlene Miller. Ms. Miller was the 2nd shift supervisor when Pavan and Ashwani began working for Fred J. Miller, Inc. Ms. Miller stated that Ashwani Sachdeva began coming in to work with his wife right after she started working for them. Ms. Miller added that Ashwani Sachdeva came to work approximately four (4) days per week and stayed for three (3) or four (4) hours each time he was there. Ms. Miller stated that Ashwani Sachdeva was never on the payroll himself and he requested that the hours he worked be added to his wife's time sheet and for her to be paid for his hours. Prepared Telephone Interview Memo. * * *
 {¶ 17} "On April 21, 1999, Marlene Miller with Fred J. Miller, Inc. telephoned and provided the approximate hours Sachdeva worked between 06/08/98 through 10/31/98. Sharp documented the information provided by Ms. Miller. * * *" (Emphasis sic.)
 {¶ 18} 8. Agent Sharp conducted an interview with relator while his attorney was present. Because of a potential difficulty with the English language, relator's attorney, Adam Leonatti, spoke for him and the following notes were taken:
 {¶ 19} "Leonatti then stated that Sachdeva's culture and the American culture are quite different and noted that Sachdeva was only `helping out' at Fred J. Miller to `hold' his brother's job for him. Leonatti further added that Sachdeva's brother had to leave the state for a short period of time and Sachdeva was merely trying to assure his brother did not lose his job. Leonatti then stated that Sachdeva did not fully understand that what he was doing would be considered `working'. With Leonatti's permission Sharp then asked Sachdeva if he had signed the C-94's he submitted to the BWC. Sachdeva stated he usually signed his first name only on the BWC forms. Leonatti then stated that he did not feel that Sachdeva fully understood the BWC paperwork and really wasn't sure what he was signing. Sharp prepared an Interview Memo. * * *"
 {¶ 20} With regard to the elements of fraud, Ms. Sharp noted as follows at the end of her report:
 {¶ 21} "* * * A representation, or when there is a duty to disclose, conceal-ment of fact:
 {¶ 22} "Injured worker Ashwani Sachdeva failed to notify the BWC that he was working at Fred J. Miller, Inc. as a general laborer while receiving Living Maintenance Wage Loss benefits. Sachdeva had a duty to disclose all earnings to the BWC for calculation of his Living Maintenance Wage Loss benefits and failed to do so.
 {¶ 23} "* * * Which is material to the transaction at hand:
 {¶ 24} "The BWC paid Living Maintenance Wage Loss benefits to Sachdeva based on these misrepresentations.
 {¶ 25} "* * * Made falsely with the knowledge of its falsity, or with such utter disregard or recklessness as to whether it is true or false that knowledge may be inferred:
 {¶ 26} "Ashwani Sachdeva's concealment of his improper conduct caused the BWC to pay Living Maintenance Wage Loss benefits. But for Sachdeva's concealment of his improper conduct, the BWC would not have made the improper payments.
 {¶ 27} "* * * With the intent of misleading another into relying upon it:
 {¶ 28} "Ashwani Sachdeva failed to report his work activities at Fred J. Miller, Inc. to any BWC personnel when he submitted paperwork to receive Living Maintenance Wage Loss benefits. Sachdeva was aware of his duty to inform the BWC of all earnings per a letter sent to him dated 01-26-95 and the BWC C-94-A Wage Statements he completed and submitted to the BWC.
 {¶ 29} "* * * Justifiable reliance upon the representation or concealment:
 {¶ 30} "The BWC justifiably relied on the documents submitted by the claimant to pay Living Maintenance Wage Loss benefits.
 {¶ 31} "* * * A resulting injury proximately caused by the reliance:
 {¶ 32} "The BWC's reliance on the claimant's documents and representations caused the BWC to make improper payments from the State Insurance Fund to the claimant, thereby, injuring the State Insurance Fund." (Emphasis sic.)
 {¶ 33} 9. A hearing was held before a district hearing officer ("DHO") on May 7, 2002, and the transcript of the proceedings is in the record at pages 46 through 79. Two witnesses testified: Ms. Sharp and Ms. Miller. Ms. Miller indicated that she first met relator in September 1997, when he and his brother Aneal came to see her to help Aneal get a job. At that time, no jobs were available at the company. Later, a job was available and Ms. Miller called relator to ask whether or not Aneal would be able to work. Relator informed her that Aneal was currently working in Pittsburgh, Pennsylvania, but that he would come back if he knew a job was available. According to Ms. Miller, relator then indicated that he was willing to come and work for the company to hold the job for his brother until his brother could return. She testified that relator indicated that he did not want to be paid for this work, but that Ms. Miller informed him that he could not just work for free. Accordingly, relator then indicated that Ms. Miller could pay him but that they should put the money on relator's wife's paycheck because his current employer would not approve of him moonlighting and he wanted to be sure that he paid the taxes that would be due. Ms. Miller also testified that she believed she had told Ms. Sharp this in the initial interview.
 {¶ 34} 10. During the hearing, relator's counsel argued that relator should not lose all of his LMWL benefits which had been paid; instead, counsel argued that relator was still entitled to a certain amount of LMWL benefits because, even once the additional wages paid by Fred J. Miller were added in, relator still had a wage loss.
 {¶ 35} 11. The DHO issued an order granting the motion of the BWC and made the following relevant findings: when relator worked for Fred J. Miller, he was performing the same work he performed during his prior position of employment; relator requested that all the compensation be made on his wife's paycheck; that relator was overpaid LMWL benefits for the time period June 7, 1998 through October 25, 1998, and that the overpayment be recouped pursuant to the fraud provisions of R.C.4123.511(J). The DHO specifically noted the following elements of fraud:
 {¶ 36} "The District Hearing Officer finds that the Bureau of Workers' Compensation has provided reliable probative and substantial evidence of fraud in this claim. The Industrial Commission finds that the claimant was employed as a fabric cutter with Fred J. Miller, which is the same position of employment he held prior to the injury. The claimant performed this job while also performing a job as a diamond seller with Gems One. The claimant only listed the employment of Gem's One on the C-140's and as a result of only listing his employment as a diamond seller, received Living Maintenance Wage Loss from 06/07/1998 through 10/25/1998. Under the Living Maintenance Wage Loss guidelines, if you return to your former position of employment you are no longer eligible for such benefits. The District Hearing Officer finds that the claimant knowingly signed the C-140s requesting Living Maintenance Wage Loss based only on the income earned at Gem's One. In doing so the Hearing Officer finds that the claimant had the intent of misleading those examining the C-140s to believe and rely upon the misrepresentation that he was only working at Gem One as a diamond seller in order to receive the Living Maintenance Wage Loss benefits. The District Hearing Officer finds that the Bureau of Workers' Compensation justifiably relied upon the claimant's representation that he was only working as a diamond seller in paying these benefits. Finally, the District Hearing Officer finds that the Bureau suffered an injury in the form of economic loss for compensation paid to the claimant proximately caused by the reliance on the claimant's assertion that he was only working as a diamond seller during the time period in question and not working as a fabric cutter which was his former position of employment.
 {¶ 37} "Based upon the foregoing, the District Hearing Officer orders that the claimant's Living Maintenance Wage Loss benefits paid from 06/07/1998 through 10/25/1998 are found to be overpaid and the Bureau of Workers' Compensation motion requesting a finding of fraud is granted.
 {¶ 38} "This order is based on the wage statements from Fred J. Miller Company as to the claimant's earnings during the time period in question, the testimony of Mrs. Miller as to the hours worked by the claimant, as well as the fact that the claimant was working as a fabric cutter which was his former position of employment, and the Living Maintenance Wage Loss guidelines." (Emphasis sic.)
 {¶ 39} 12. Relator appealed the DHO order and the matter was heard before a staff hearing officer ("SHO") on July 8, 2002. The hearing was transcribed and is part of the record at pages 8 through 26. No witnesses testified and the transcript merely includes the arguments of counsel. Ultimately, the SHO modified the prior DHO's order in minor ways which are not relevant.
 {¶ 40} 13. Relator's appeal was refused by order of the commission mailed July 27, 2002.
 {¶ 41} 14. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law:
 {¶ 42} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show that he has a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm. (1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986),26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond Foundry Co. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981), 68 Ohio St.2d 165.
 {¶ 43} R.C. 4121.67 provides, in pertinent part, as follows:
 {¶ 44} "Reemployment to be encouraged; payment for wage losses of rehabilitated employee
 {¶ 45} "The administrator of workers' compensation, with the advice and consent of the workers' compensation oversight commission, shall adopt rules:
 {¶ 46} "* * *
 {¶ 47} "(B) Requiring payment, in the same matter as living maintenance payments are made pursuant to section 4121.63 of the Revised Code, to the claimant who completes a rehabilitation training program and returns to employment, but who suffers a wage loss compared to the wage the claimant was receiving at the time of injury. Payments per week shall be sixty-six and two-thirds per cent of the difference, if any, between the claimant's weekly wage at the time of injury and the weekly wage received while employed, up to a maximum payment per week equal to the statewide average weekly wage. The payments may continue for up to a maximum of two hundred weeks but shall be reduced by the corresponding number of weeks in which the claimant receives payments pursuant to division (B) of section 4123.56 of the Revised Code." (Emphasis sic.)
 {¶ 48} As referred to above, LMWL benefits are paid in the same manner as LM payments under R.C. 4121.63, which provides, in pertinent part, as follows:
 {¶ 49} "Claimants who the administrator of workers' compensation determines could probably be rehabilitated to achieve the goals established by section 4121.61 of the Revised Code and who agree to undergo rehabilitation shall be paid living maintenance payments * * *.
 {¶ 50} "Living maintenance payments shall be paid in weekly amounts, not to exceed the amount the claimant would receive if the claimant were being compensated for temporary total disability, but not less than fifty per cent of the current state average weekly wage. * * *
 {¶ 51} "A claimant receiving living maintenance payments shall be deemed to be temporarily totally disabled and shall receive no payment of any type of compensation except as provided by division (B) of section4123.57 of the Revised Code for the periods during which the claimant is receiving living maintenance payments."
 {¶ 52} Ohio Adm. Code 4123-18-02 provides that the objectives of the rehabilitation division are:
 {¶ 53} "(1) To return the injured or disabled worker to his former employer in his original job, or, if this is not possible;
 {¶ 54} "(2) To encourage the employer to modify the original job or to provide employment in a different job, or, if this is not possible;
 {¶ 55} "(3) To assist the injured worker in finding employment in a related industry, and if not possible then in any industry.
 {¶ 56} "If the objectives, as outlined above, prove unsuccessful, retraining will be considered."
 {¶ 57} Ohio Adm. Code 4123-18-03 provides guidelines for referral to and acceptance into vocational rehabilitation and provides, in relevant part, as follows:
 {¶ 58} "(A) Scope of vocational rehabilitation.
 {¶ 59} "(1) Vocational rehabilitation is the process of restoring the vocational functioning of a worker who experiences an industrial injury or occupational disease. As the injured worker progresses toward medical stability, the worker should be assessed for vocational rehabilitation. * * *
 {¶ 60} "* * *
 {¶ 61} "(B) Eligibility for vocational rehabilitation services.
 {¶ 62} "(1) Recognized allowance of claim.
 {¶ 63} "* * *
 {¶ 64} "(2) Claimant's allowed industrial injury reflects a significant impediment to employment or maintaining employment (job retention). Priority shall be given in the order indicated below:
 {¶ 65} "* * *
 {¶ 66} "(b) Receiving temporary total, wage loss, a scheduled award under division (B) of section 4123.57 of the Revised Code, or permanent total compensation as of the date of referral.
 {¶ 67} "* * *
 {¶ 68} "(e) Claimant is no [sic] receiving compensation but claimant has reached maximum medical improvement and continues to have job restrictions documented by the physician of record."
 {¶ 69} Ohio Adm. Code Section 4123-18-21, provides further, in pertinent part, as follows:
 {¶ 70} "(A) The rehabilitation division shall authorize the bureau of workers' compensation to make payments to claimants who complete a rehabilitation program and who return to work, and who suffer a wage loss as a consequence thereof.
 {¶ 71} "(B) Payments shall be sixty-six and two-thirds per cent of the difference between the greater of the claimant's full weekly wage or average weekly wage on the claim for which the claimant underwent a rehabilitation program and the weekly wage received while employed up to a maximum per week equal to the statewide average weekly wage.
 {¶ 72} "(C) A claimant shall be considered for such payments upon written certification to the bureau by the division that the claimant has completed a rehabilitation plan as described in rule 4123-18-05 of the Administrative Code and has successfully returned to employment. The bureau shall be responsible for calculating wage loss payment amounts based upon the claimant's wage statement or other information on the subject."
 {¶ 73} Although neither the Revised Code nor the Administrative Code include any specific requirements that a claimant be physically incapable of performing their former position of employment, entitlement is still tied to a certain inability to perform work, especially one's former job. The number one goal of the program is to return the injured worker to his former job. As such, this magistrate finds that the commission's finding that relator could physically perform his former job would constitute grounds to terminate his benefits.
 {¶ 74} Relator then argues that because he made less money than he had been making before his injury even when the commission included the wages which he did not report, that the commission abused its discretion by declaring an overpayment for the entire period. Relator argues that the commission should recalculate the amount of LMWL benefits to which he would have been entitled had he reported all of the income and then declare an overpayment as to the remainder.
 {¶ 75} The commission disagrees with relator's argument. The commission argues that because of the finding of fraud, the commission is entitled to recoup all the LMWL benefits which were paid to relator.
 {¶ 76} In State ex rel. Ellis v. Indus. Comm. (2001),92 Ohio St.3d 508, the claimant was receiving TTD compensation. After a BWC investigation and a hearing before the commission, the commission determined that the claimant had been gainfully employed for a certain number of months during the time period in which he received TTD compensation. The commission concluded that the BWC provided reliable, probative and substantial evidence of fraud and, as such, declared an overpayment for the entire time period and not just that time period wherein it was proven that the claimant had been working. The claimant filed a mandamus action and this court concluded that the commission did not abuse its discretion. Claimant appealed the matter as of right to the Ohio Supreme Court which affirmed this court's decision. The court concluded that inasmuch as the commission determined that the claimant's C-84s were fraudulent, it was not an abuse of discretion for the commission to find that there was no basis upon which to allow the claimant to retain any of the TTD compensation that the claimant induced the BWC to pay based upon those fraudulent documents.
 {¶ 77} Although not directly on point, the decision in Ellis indicates that the commission does not abuse its direction where, upon a finding that a claimant induced payment of compensation by fraud, the commission declares an overpayment for the entire time period and not just for those time periods or for those amounts which the claimant would otherwise be entitled. Applying that reasoning to the present facts of this case, this magistrate finds that, upon the finding of fraud and upon the finding that relator was performing the work of a fabric cutter, which was his former occupation, the commission did not abuse its discretion in declaring an overpayment for the entire period. As such, this argument of relator is not well-taken.
 {¶ 78} Relator also contends that the commission abused its discretion by finding fraud. Relator contends that Ms. Miller provided an innocent explanation as to relator's motivations in not directly reporting his wages earned at Fred J. Miller.
 {¶ 79} The elements of fraud are well established. The Ohio Supreme Court has set forth the criteria in Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, as follows.
 {¶ 80} There is no doubt that relator had a duty to disclose all of his earnings. There also is no dispute that the information was material to the transaction at hand. Further, it cannot be disputed that relator knew that he was falsely reporting his income. Furthermore, the BWC justifiably relied upon the representation for concealment and paid out money and, as such, was injured as a result. Relator contends that there was no evidence of intent to mislead the BWC into relying upon that evidence. In this regard, relator contends that the record establishes that his intent was simply to secure a job for his brother.
 {¶ 81} The commission had before it the report prepared by Agent Sharp wherein Ms. Miller did not mention relator's brother Aneal and did not mention that relator was attempting to hold a job for his brother. Instead, the report simply indicates that Ms. Miller was asked by relator to put his wages on his wife's paycheck. Although later at the hearing, Ms. Miller testified concerning relator's brother, the commission was then left with the task of determining Ms. Miller's credibility. Questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. Teece, supra. In the present case, this magistrate cannot say that the commission abused its discretion in finding that relator had the intent to mislead the BWC into relying upon his false statements. Relator could have testified before the commission, with an interpreter if necessary, and presented his explanation. Relator chose not to. As such, the commission did not even have the opportunity to hear relator's side of the story. Based upon the evidence before the commission, this magistrate finds that the commission did not abuse its discretion in making the finding of fraud and, as such, further finds that the commission did not abuse its discretion in declaring an overpayment for the entire time period.
 {¶ 82} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion in declaring an overpayment of his living maintenance wage loss benefits for the entire time period and this court should deny relator's request for a writ of mandamus.